ORIGINAL

ECF

FILED
AUG 4 2003
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| XAVIER CHEMICAL COMPANY,<br>Plaintiff,<br>v.<br>THE UNITED STATES OF AMERICA,<br>Defendant. | Civil Action No. 03-1823C |

**COMPLAINT**

This action is brought by Plaintiff Xavier Chemical Company ("Xavier") against defendant the United States of America under the Tucker Act, 28 U.S.C. § 1491(a)(1), for restitution and non-overlapping reliance damages caused by defendant's breach and repudiation of its obligations to Xavier under a Facilities Use Agreement between Xavier and ICI Americas, Inc. ("ICI") in which defendant stepped into the shoes of ICI and Xavier attorned to the United States Army ("Army") under the terms of the agreement. Alternatively, Xavier seeks restitution and non-overlapping reliance damages for defendant's breach and repudiation of an agreement between defendant and ICI of which Xavier was the intended direct third-party beneficiary.

**Jurisdiction**

1. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1491(a)(1).

**Parties**

2. Plaintiff is Xavier Chemical Company a corporation formed under the laws of Georgia and having its principal place of business in Atlanta, Georgia.

3. Defendant is the United States of America, acting through the Department of the Army, U.S. Army Joint Munitions Command.

**Facts**

4. The Volunteer Army Ammunition Plant ("VAAP") is a Government-owned, contractor-operated ("GOCO") army ammunition manufacturing facility located in Chattanooga, Tennessee. The Army Corp of Engineers built the VAAP between 1941 and 1943 to manufacture explosives for World War II. From January 1946 until early 1952, the VAAP was placed in standby status and was maintained by the Government. In the spring of 1952, the VAAP was reactivated in support of the Korean War, and was later reactivated in support of the Vietnam War. The VAAP is currently in inactive status.

5. The VAAP consists of nearly 7,000 acres of land and 405 buildings. In addition to numerous other structures, the VAAP contains sulfuric acid production and concentration facilities. When not required for its own use, the Army leased certain of these sulfuric acid facilities to contractors for commercial purposes. Many of these facilities ceased operating and were disassembled at various points in time from the 1970's through the 1990's.

6. The VAAP is also extensively interlaced with a utility and transportation infrastructure. The VAAP's existing utilities include water, sewer, electricity and natural gas. Twenty-three (23) miles of rail and eighty-three (83) miles of roadway are interwoven through the VAAP, offering operating contractors and tenants various modes of product transportation. The VAAP also has its own barge and unloading facility that is connected to the Tennessee River.

7. Various contractors have operated the VAAP since 1952. In November 1994, the Army, through its Operation Support Command ("OSC") awarded a five-year facilities use contract (DAAA09-94-E-0017) to ICI Americas, Inc. ("ICI") for the operation of the VAAP. Under this contract, ICI provided maintenance, surveillance and accountability of the Government property and equipment at the VAAP.

8. In entering this facilities use contract, the Army and ICI recognized that, pursuant to the Armament Retooling and Manufacturing Support Act of 1992, Pub. L. No. 102-484 (the "ARMS Act"), operating contractors of GOCO army ammunition plants such as ICI should "pursue the use of idle facilities for the benefit of both the Government and the Operating Contractors." Congress enacted the ARMS Act in order to defray the Army's costs of maintaining inactive ammunition plants and to further certain United States' policies concerning GOCO ammunition manufacturing facilities.

9. To facilitate this goal, the ARMS Act authorized facilities contractors such as ICI to "enter into multiyear subcontracts for the commercial use of" the Army's facilities. *Id.* at § 194. The contract between Army and ICI expressly recognized this right and stated:

> [t]he Government hereby authorizes [ICI] to enter into tenant use contracts under this facility use contract during the term hereof for specific uses of the facility as approved by the Government for time periods not to exceed twenty-five (25) years from the date of the tenant use contract, notwithstanding the fact that said time periods may exceed the term of this contract.

10. Pursuant to and in furtherance of the ARMS Act and ICI's prime contract, ICI and Xavier entered into the Facilities Use Agreement ("FUA") in July 1996 to allow Xavier to operate a sulfuric acid regeneration ("SAR") plant and related facilities on the VAAP and to

engage in related operations. Xavier entered the FUA after its market analysis revealed the need for an additional sulfuric acid supplier in the Chattanooga region.

11. The FUA granted Xavier the use of certain VAAP facilities, including transfer and terminal facilities, for use in connection with its operations. The FUA was for a period of twenty-five (25) years and gave Xavier the option to renew the agreement for two additional twenty-five (25) year periods.

12. The FUA contains an attornment clause, which states:

> Upon any termination of ICI as the Contractor for the use of VAAP, the SUBCONTRACTOR shall attorn to the United States Army, or at the option of the United States Army, its subsequent contractor, and recognize the United States Army, or its subsequent contractor, as ICI under this Agreement.

13. In exchange for its long term contract rights, Xavier was required to make several payments. Pursuant to paragraph 2 of the FUA, Xavier provided ICI with a $950,000 transaction fee. ICI, in turn, gave this $950,000 fee to the Army. Xavier was also required to pay an annual rental payment of $50,000. Xavier made these $50,000 annual payments to ICI from 1996 through the 1998 termination of ICI's contract with the Army. Following the termination of ICI as the Facilities Contractor, Xavier made its annual payments directly to the Army. In addition to the transaction fee and annual rental payments, Xavier invested significant funds to design, develop, and improve facilities at the VAAP.

14. Via modification P00004, executed March 30, 1998, the Army and ICI agreed that Contract DAAA09-94-E-0017 would terminate on December 31, 1998.

15. In a November 18, 1998 letter, the Army notified Xavier that the prime facilities use contract between the Army and ICI would expire on December 31, 1998. The Army stated

that it recognized that Xavier had an agreement with ICI that allowed Xavier to "conduct business" on the VAAP. The letter also stated that the Army and Xavier would need to execute a transition agreement in order to "sever ICI's responsibility . . . , establish privity of contract between [Xavier] and the Army and confirm that the agreement in Army possession is the most current agreement between the parties."

16. On December 9, 1998, the Army entered an agreement with ICI "in order to effect orderly completion" of its contract with ICI. In this Agreement, the Army agreed that it would assume ICI's role under the FUA whether or not a subsequent contract was entered into between the Army and an ICI Subcontractor. Specifically, the Army agreed that it:

> will attempt to enter into a direct contractual relationship with each Subcontractor, pursuant to which the Army and not ICI will be responsible to the Subcontractor for all rights, duties and obligations arising under the Subcontract on and after January 1, 1999. As to each Subcontractor that does not enter into such direct contractual relationship with the Army prior to January 1, 1999 ("Non-Signing Subcontractor"), Army will assume and be responsible for all rights, benefits, duties and obligations under each such Non-Signing Subcontractor's Subcontract as though it were a party thereto, effective January 1, 1999; and, except as provided herein, ICI will remain responsible under each such Subcontracts for actions and events through December 31, 1998 and have no rights, benefits, duties, and obligations under any such Subcontract on or after January 1, 1999.

17. The Army notified Xavier on December 30, 1998 that the Army's contract with ICI would expire the next day. In this letter, the Army stated that:

> The Army and ICI have, in recent weeks, attempted to negotiate a three party arrangement which would more clearly define our rights and responsibilities. Since we have not reached such an agreement, you are hereby advised that it is the Army's intent to allow you to remain beyond the scheduled December 31, 1998, expiration of the ICI contract with the Army, on a month-to-month basis, provided you are not in default of your current agreement.

> Further, the Army proposes to collect from you rent and service fees beginning January 1, 1999.

The Army went on to note that it "would still like to enter into a suitable agreement that would replace [Xavier's] agreement with ICI and allow [Xavier] to remain at [the VAAP] until the property is disposed to new owners."

18. In response to the Army's December 30, 1998 letter, representatives of Xavier had several discussions with Army representatives in January and February 1999 in which Xavier advised the Army that, in view of the FUA's attornment provision, no three party agreement was necessary.

19. In 1999 and 2000, Xavier paid its $50,000 annual rental payments due under the FUA to the Army. The Army accepted these payments.

20. In a June 30, 2000 letter to the Contracting Officer, Xavier exercised its right to extend the term of the FUA for a period of twenty-five (25) years pursuant to Paragraph 4 of the FUA. By exercising the first of its two twenty-five (25) year options, Xavier extended the FUA's expiration date from on or about August 1, 2021 through on or about August 1, 2046. The Army expressed no objection to Xavier's exercise of its option.

21. In August 2000, Xavier began preparing for the first of its operational phases under the FUA – the transfer of sulfuric acid. In order to engage in these transferring operations, Xavier attempted to utilize certain VAAP railroad facilities, as authorized in the FUA. Xavier was prevented from doing so, however, because Chattanooga Railcar Services ("CRS") was storing railcars on tracks that Xavier had a contractual right to utilize.

22. Throughout August, Xavier placed numerous phone calls, and submitted written correspondence, to the Army to request that certain railroad facilities be cleared so that Xavier could inspect, repair, and begin using the railway.

23. On August 28, 2000, Xavier sent a letter to the Army detailing issues it was experiencing at the VAAP facility. Xavier wrote:

> In reliance on [Xavier's FUA], Xavier has made a large investment — paying, to date, more than $1.3 million to the Army (through ICI and another contractor) and obligating itself to pay approximately $32 million in additional costs associated with the contract and the facilities. If the Army does not honor the contract, Xavier estimates that it stands to lose as much as $20 million.
>
> In 1998, the Army began actions to divest itself of some or all of the VAAP. Army representatives have since been less than clear about whether or not the Army will continue to honor its obligations to permit Xavier to use the VAAP facilities to the extent and for the time period specific in the contract. Some Army representatives have suggested, for example, that Xavier is now only a holdover, month-to-month tenant. Holdover tenancy and month-to-month tenancy are both entirely at odds with the 25-to-75 year term provided by the Agreement. In addition, the Army's suggestion that Xavier is a holdover with a monthly term appears to repudiate the Agreement. Before inducing Xavier to spend yet more money under these circumstances, the Army has an obligation to affirm that it is not repudiating the Agreement and that it will comply with [the] contract, including the terms that relate to the scope and duration of Xavier's use of VAAP facilities.

The Army did not respond to Xavier's August 28, 2000 letter.

24. On October 2, 2000, after learning that the Army and the General Services Administration planned to transfer portions of the Plant to new owners and users, Xavier's then counsel, Ross Branstetter, wrote the Army that Xavier had substantial rights in certain VAAP facilities, and that if such facilities were to be included in the transfer, they would be "for many years subject to Xavier's preexisting rights and to Xavier's contractually authorized, potentially

competing uses." Xavier cautioned that any transfer must be compatible with and not diminish Xavier's rights and authorized uses.

25. On October 10, 2000, because the necessary railways were still not cleared, Xavier sent the Army a letter again explaining the need for Xavier to inspect, repair, and begin using the railway. Xavier noted that because the Army had not granted its request for limited and nonexclusive usage of certain tracks, Xavier's business operations were adversely impacted. Xavier explained that it was taking steps to mitigate the impact, but that it would "soon reach a point beyond which each day that Xavier is denied use of the identified trackage will cause a day-for-day slip in [Xavier's] commercial activities and will have considerable financial impact."

26. Despite Xavier's numerous and urgent requests beginning in August 2000, the Army did not respond to Xavier until November 14, 2000. At that time, the Army informed Xavier by letter that Xavier: (1) was not authorized to engage in terminalling and transfer activities; (2) was restricted in its rail use; (3) pursuant to FUA paragraph 12b, must obtain the Army's approval to bring hazardous materials onto VAAP; (4) could likely not obtain regulatory approval for its operations; and (5) had not demonstrated a need for the removal of CRS railcars.

27. On November 22, 2000, Xavier responded to the Army's letter and explained why each of the Army's positions were erroneous, contrary to the terms and conditions of Xavier's FUA, and ignored past submissions Xavier made to the Army.

28. In early December 2000, the Army requested that Xavier remove its railcars from the VAAP and continued to demand production of documentation relating to regulatory and statutory approvals. On December 8, 2000, Xavier responded to the recent demands and

removed its railcars, at its own expense, from the VAAP, provided the requested documentation, and, once again, stated that these demands were contrary to Xavier's FUA.

29. On December 20, 2000, in response to "various telephone calls and letters," the Army counsel sent Xavier's counsel a letter. The letter stated:

> First, let me address the issue of Xavier's real property interest that was the subject of Mr. Branstetter's letter. While the Army foresees all transfers at [VAAP] being subject to existing agreements, the Army has a significantly different view of Xavier's real property interest. Xavier entered into a facilities use agreement (FUA) with ICI Americas (ICI) to operate facilities as sulfuric acid plant at [VAAP]. ICI was authorized to enter into this FUA via its prime contract with the Army under the Armament Retooling and Manufacturing Support (ARMS) Initiative Act of 1992. However, under that authority, ICI was required to obtain the Army's approval to allow the use of specific facilities in support of specific proposed tenant operations. Full approval by the Army was not provided to ICI in support of the operation of the sulfuric acid plant, as certain environmental requirements, which are discussed below, had to be completed prior to the Army allowing operations to begin.
>
> When ICI's prime contract expired on December 31, 1998, the Army attempted to enter into a direct contractual relationship with all ARMS tenants at [VAAP], including Xavier. On December 30, 1998, when the Army was unable to reach agreement with Xavier, the Army granted Xavier the authority to remain at [VAAP] on a month-to-month basis until an agreement suitable to all parties was signed, provided Xavier did not violate the terms and conditions of its FUA with ICI, and provided appropriate documentation was received as was specified to enable a full facility use approval by the Army.
>
> The Army views this month-to-month authorization as the extent of Xavier's real property interest. The FUA did not attorn to the Army, as the Army was not a party to the FUA and never authorized ICI to grant attornment. The Army remains willing to enter into a direct contractual relationship with Xavier; however, the term shall not exceed July 31, 2021, the base period of Xavier's FUA with ICI. Any sub-agreement was limited to 25 years by the Army's prime contract with ICI, which Xavier had a duty to

> discern. Allenfield Associates v. the United States, 40 Fed. Cl. 471 (1988 U.S. Claims Court). Therefore, the unilateral options which extended Xavier's FUA beyond 25 years are void.

30. On January 16, 2001, Xavier (through counsel) responded, in part, to the December 20, 2000 letter and again asserted that the Army's regulatory and statutory demands were not consistent with Xavier's FUA.

31. On February 8, 2001, Army counsel sent Xavier another letter which reiterated the Army's demands for regulatory and statutory documentation and, in addition, stated that the Army would not permit Xavier to conduct either sulfuric acid terminalling or manufacturing at the SAR plant "until Xavier has entered into a Corps of Engineers lease under 10 U.S.C. § 2667."

32. On February 20, 2001, Xavier (through counsel) informed the Army that such a lease with the Corp was unnecessary and that the regulatory and statutory requirements were not required by Xavier's FUA. However, stating that Xavier reserved all existing rights, Xavier agreed to continue to attempt to meet the Army's demands while it sought a meeting with senior Army officials to persuade them to change the Army's stated position.

33. Paragraph 13 of the FUA, "DEFAULT BY THE SUBCONTRACTOR," states:

> If the SUBCONTRACTOR shall allow any payment required hereunder this Agreement to be in arrears more than thirty (30) days after written notice of such delinquency (only one written notice and only one such opportunity to cure shall be allowed during any 360 day period), or shall remain in default under any other condition of this Agreement for a period of thirty (30) days after written notice from ICI (only one such written notice and only one such opportunity to cure shall be allowed during any 360 day period), or should any other person than the SUBCONTRACTOR secure possession of the Facilities, or any party thereof, by reason of any receivership, bankruptcy proceedings, or other operation of law in any manner whatsoever,

> ICI may, without notice to the SUBCONTRACTOR, terminate this Agreement, take possession of the Facilities and remove all persons and property therefrom, without being deemed guilty in any manner of trespass, and relicense the Facilities, or any part thereof, at such fees as ICI may with reasonable diligence be able to secure. Should ICI be unable to relicense after reasonable efforts to do so, or should such fees be less than the fees or payment the SUBCONTRACTOR was obligated to pay under this Agreement plus the expense of relicensing, then the SUBCONTRACTOR shall pay the amount of such deficiency to ICI.

34. Paragraph 14 of the FUA, "DEFAULT BY ICI," states:

> If ICI defaults in the performance of any term, covenant, or condition required to be performed by it under this Agreement, the SUBCONTRACTOR may elect any one of the following:
>
> a. After not less then thirty (30) days written notice to ICI, the SUBCONTRACTOR may remedy such default by any necessary action, and in connection with such remedy, may pay expenses and employ counsel; all sums expended or obligations incurred by the SUBCONTRACTOR in connection therewith shall be paid by ICI to the SUBCONTRACTOR on demand, and on failure of such reimbursement, the SUBCONTRACTOR may in addition to any other right or remedy that the SUBCONTRACTOR may have, deduct the cost and expenses thereof from fees subsequently becoming due hereunder this Agreement; or
>
> b. Elect to terminate this Agreement on giving at least thirty (30) days written notice to ICI of such intention, thereby terminating this Agreement on the date designated in such notice, unless ICI shall have cured such default prior to expiration of the thirty-day period.

35. By a letter dated August 17, 2001, the Army advised Xavier that, effective the same day, it was terminating Xavier's "right to occupy premises and to conduct business on [the VAAP]." The Army explained that the termination was "due to Xavier's failure to comply with

the conditions set forth in the Army's December 30, 1998 letter to Xavier and other Army requirements, as conveyed repeatedly to Xavier personnel." The Army went on to state that:

> Pursuant to the December 30, 1998 letter, Xavier must comply with the terms and conditions of its facilities use agreement (FUA) with ICI Americas. However, Xavier failed to follow several provisions of its FUA. Each failing, in and of itself, provides sufficient and independent grounds to terminate Xavier's right to occupy premises and to conduct business on [the VAAP].

The specific examples cited by the Army of Xavier's alleged failure to comply with the FUA were: 1) "Xavier failed to pay its annual rental payment of $50,000 on August 1, 2001, as required by Paragraph 2 of its FUA"; 2) "Xavier failed to maintain pollution insurance in accordance with its FUA"; and 3) Xavier acted outside of the scope of its authorized activities by violating the Army's directions regarding Xavier's transferring operations, as set forth in the Army's June 11, 2001 letter and other correspondence. With respect to Xavier's alleged failure to timely pay its 2001 rental payment, the Army stated that Xavier was not entitled to cure this alleged defect pursuant to FUA paragraph 13 because "Xavier used its 'cure opportunity' when, on August 17, 2000, Xavier was notified that its rental check was returned for non-sufficient funds, and on September 14, 2000, finally tendered a good and sufficient funds payment."

36. After setting forth its alleged basis for terminating Xavier's rights at the VAAP, the Army's August 17, 2001 letter instructed Xavier to "cease all operations effective immediately" and to "contact the Commander's Representative at [the VAAP] to coordinate removal of any Xavier-owned property." The Army also noted it was reserving "its right to re-license the facility or to assess rental fees against Xavier, as permitted under paragraph 13 of the FUA, if [Xavier] fails to remove its property within 30 days."

37. Citing its August 17, 2001 letter, the Army, on August 23, 2001, informed Xavier that effective that day, Xavier (as well as its "agents, contractors, sub-contractors, or assignees") was prohibited "from exercising the privilege of entering [the VAAP], to include the administration area, for any purpose, except when escorted by [the VAAP Commander's] Representative or his designee." The Army stated that if Xavier did not remove its personal property by September 7, 2001, the Army would remove said property and bill Xavier for the "cost plus the trespass fees." Moreover, the Army cited the trespassing prohibitions in 18 U.S.C. § 1382 and noted that if Xavier was found on [the VAAP], it would refer the case to the United States Attorney.

38. On August 27, 2001, Xavier responded to the Army's correspondence of August 17 and 23, 2001. In its letter, Xavier first explained that, based on the FUA's attornment clause and the Army's December 9, 1998 agreement with the ICI, the Army functioned as ICI for purposes of the FUA. Xavier stated that by way of the Army's August 17, 2001 letter, the Army recognized that it "has stepped into ICI's shoes for purposes of the FUA, as the Army is purporting to terminate Xavier's rights at the [VAAP] on the basis of Xavier's alleged noncompliance with its obligations to ICI under the FUA." Xavier then explained why it was not in default of any of its obligations under that FUA. It further noted that even if it were in violation of the FUA, the Army failed to provide Xavier with a 30-day period to cure the alleged defaults as required by the FUA. With respect to the alleged untimely payment of the annual rent, Xavier explained that because more than 360 days had elapsed from the Army's prior cure notice of August 17, 2000, the Army failed to comply with the FUA's paragraph 13 notice and cure provisions regarding the rental payment. Xavier also noted that, even if less than 360 days

had passed since the last cure notice, the Army had no right to terminate Xavier's rights because pursuant to the parties' December 1998 agreement, Xavier posted a Supplemental Surety Bond to satisfy its annual rental payment. The 1998 agreement precluded the Army from terminating Xavier for a delayed payment that could be satisfied by the Bond. Additionally, Xavier explained that the Army's August 17, 2001 letter failed to

> recognize that the FUA provides separate notice-and-cure periods for a delinquent payment and for a violation of "any other condition." For each type of default, the FUA provides that a written notice and opportunity to cure shall be allowed. Thus, even if the Army were not required to give a cure notice regarding the 2001 rental payment, Xavier is still entitled to an independent notice and cure opportunity for allegedly violating its pollution insurance obligations and the scope of its authorized activities.

39. By its August 27, 2001 letter, Xavier informed the Army that by failing to provide the requisite notice and cure periods and wrongfully attempting to terminate Xavier's rights at the VAAP, the Army was in default of the FUA. Xavier's August 27, 2001 letter thus served as the written notice required by paragraph 14(a) of the FUA that, within 30 days of the letter, Xavier could bring an action to remedy the Army's breach.

40. On September 25, 2001, after reviewing Xavier's August 27, 2001 letter, the Army informed Xavier that it did "not intend to rescind its decision regarding Xavier as contained in [the Army's] August 17 and 23, 2001 letters." Xavier was compelled to vacate the VAAP.

41. During its performance under the FUA, Xavier expended funds in reliance upon the FUA and the December 9, 1998 agreement between the Army and ICI. Xavier has identified these funds as follows:

| Payee | Reference | (Million $) |
|---|---|---|
| TRINITY INDUSTRIES | tank cars | 2.31 |
| FIRST COMMERCE | tank cars/ Jgmnt | 3.1 |
| PRINVEST | partial Bridge payment | 1.0 |
| PRINVEST | Interest /other Balance | 2.24 |
| RRI | Loan Cmmt fee | 0.95 |
| ORION | Loan Cmmt fee | 0.175 |
| EARTHTECH/ CONTRACTORS | Engineering/Design/Construction work at VAAP site | 1.0 |
| GESI | Eng., Site Work - construction Pollution Control Upgrades at VAAP | 0.45 |
| Multiple Firms | Legal fees | 0.25 |
| LDA/subs | Bldg Upgrds/VAAP | 0.1 |
| TIPPS/TVRM | Upgrade VAAP site Rail lines | 0.16 |
| Ammonia Tanks(3) | Purchased from Army for use | 0.06 |
| | **TOTAL:** | 11.795 |

42. By letter dated, February 13, 2003, Xavier submitted a claim pursuant to the Contract Disputes Act, 41 U.S.C. § 601 *et seq.*, to the Army Contracting Officer demanding payment of $12,945,000 in restitutionary and reliance damages based on the Army's repudiation and/or breach of the FUA and/or its agreement with ICI of which Xavier was the intended third party beneficiary.

43. By letter dated April 9, 2003, the Contracting Officer responded to Xavier's February 2003 claim stating that the Contract Disputes Act did not apply and refused to issue a Contracting Officer's Final Decision.

**COUNT I**
**(Breach and Repudiation of the FUA)**

44. Plaintiff incorporates paragraphs 1 through 43 above.

45. The Army breached and repudiated the FUA by its actions described in paragraphs 21 to 31.

46. By its breach and repudiation, the Army injured Plaintiff.

**COUNT II**
**(Breach and Repudiation of the December 9, 1998 Agreement with ICI)**

47. Plaintiff incorporates paragraphs 1 through 46 above.

48. The Army breached and repudiated the December 9, 1998 agreement with ICI of which Xavier was an intended third party beneficiary by its actions described in paragraphs 21 to 31.

49. By its breach and repudiation, the Army injured Plaintiff.

**COUNT III**
**(Breach of the FUA)**

50. Plaintiff incorporates paragraphs 1 to 49 above.

51. The Army's improper termination of Xavier's rights in August 2001 constituted a breach of the FUA.

52. By its breach, the Army injured Plaintiff.

**COUNT IV**
**(Breach of the December 9, 1998 Agreement with ICI)**

53. Plaintiff incorporates paragraphs 1 to 52 above.

54. The Army's improper termination of Xavier's rights in August 2001 constituted a breach of the December 9, 1998 agreement between the Army and ICI for which Xavier was an intended third party beneficiary.

55. By its breach, the Army injured Plaintiff.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment in their favor against the United States as follows:

(a) for judgment awarding Plaintiff restitution damages in the amount of $1,150,000 comprised of the $950,000 transaction fee and the four $50,000 annual rental payments from 1996-2000 paid by Xavier under the FUA;

(b) for judgment awarding Plaintiff reliance damages in the amount of at least $11,795,000 for amounts Plaintiff expended in reliance upon the FUA and the December 9, 1998 agreement between the Army and ICI;

(c) for judgment awarding Plaintiff any and all other damages to which it is entitled by law;

(c) for judgment awarding Plaintiff costs and interest as allowed by law; and

(d) for judgment awarding such other and further relief as this Court deems just.

Respectfully submitted,

Robert K. Huffman

Robert K. Huffman
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W.
Washington, D.C. 20005
202/626-5824
202/628-0858 Facsimile

Counsel for Plaintiff

*Of Counsel*:

Lisanne E.S. Cottington
MILLER & CHEVALIER CHARTERED
655 Fifteenth Street, N.W.
Washington, D.C. 20005
202/626-5883
202/628-0858 Facsimile

Dated: August 4, 2003