IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| XAVIER CHEMICAL COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 03-1823C |
| v. | ) | (Judge Futey) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S REPLY IN SUPPORT OF DISPOSITIVE MOTION

The United States respectfully submits this reply in support of its October 3, 2003 motion to dismiss and for partial summary judgment.

We demonstrated in our moving brief that, assuming a contract existed, the Army acted reasonably and within its rights, under that agreement's hazardous materials clause, in not consenting to plaintiff's ("Xavier's") proposed use of certain facilities at the Volunteer Army Ammunition Plant ("VAAP") for "terminalling and transferring" of sulfuric acid. We also established that the Army was entitled to terminate the contract, assuming one existed, when Xavier committed several material breaches within a 360-day period in 2000 and 2001.

Xavier argues that its facilities use agreement with a former contractor-manager of the VAAP expressly permitted Xavier to bring railcars of acid onto the base from elsewhere, for purposes of pumping the acid into trucks; that, in any event, counts I and II of the complaint should not be dismissed because they state a valid claim of repudiation; and that the termination

was both procedurally unsound for lack of a cure notice and substantively unwarranted, owing to prior material breaches by the Government. Xavier errs in each respect, and its errors are legal, rather than factual. (Xavier concedes the Government's proposed findings of fact, except that it contends it obtained a new insurance policy shortly before the termination.) Accordingly, the Government's motion should be granted and the complaint dismissed.

## I. The Plain Language Of The Facilities Use Agreement Limits Xavier To Operating A Manufacturing "Plant"

The first issue, assuming the Army became bound by the subcontract between Xavier and the former VAAP manager, ICI Americas Inc. ("ICI"), is whether that agreement, which expressly granted Xavier "a License to use certain facilities at VAAP . . . as a sulfuric acid plant," App. 25 (emphasis added), allowed the Army reasonably to withhold its consent to Xavier's plans to "terminal and transfer" sulfuric acid brought by rail to the base from elsewhere. See Def. Moving Br. 8-12.

The parties have framed this as a purely a legal issue of contract interpretation, suitable for resolution on summary judgment. See Olympus Corp. v. United States, 98 F.3d 1314, 1316 (Fed. Cir. 1996). Neither party argues that parol evidence regarding the original negotiations between Xavier and ICI should be consulted. See Pl. Br. 3-6; cf. McAbee Constr., Inc. v. United States, 97 F.3d 1431, 1435 (Fed. Cir. 1996).

Xavier's fundamental contention is that the express limitation in article 1 ("License To Use Facilities") of the ICI-Xavier agreement, which specifies that Xavier's license is for "a sulfuric acid plant," Def. App. 25, is not a limitation at all. Specifically, Xavier argues that because (1) the VAAP's storage and loading facilities could be used to handle acid brought to the VAAP from elsewhere and (2) the latter use is assertedly not "inconsistent" with operating an acid "plant," Pl. Br. 4, Xavier's importing sulfuric acid by rail to pump into trucks was "required for the operation and maintenance of the Facilities," within the meaning of the subcontract's hazardous materials clause. Def. App. 32 (art. 12.b) (emphasis added); Pl. Br. 5.

Xavier's contract interpretation is untenable, for several reasons. First, Xavier essentially reads the words "sulfuric acid plant" out of article 1: Xavier asserts that, by granting permission in article 1 for Xavier to operate a "plant," ICI impliedly authorized Xavier to conduct any activities that Xavier might later characterize as not "inconsistent" with sulfuric acid manufacturing, or as in some way a temporary commercial substitute for acid production. Pl. Br. 5.

Had Xavier and ICI intended the contractual license to be so broad, however, the term "plant" would be superfluous. Article 1 of the agreement could have said something like, ". . . for any purposes related to Xavier's sulfuric acid business." It does

not. A reading that nullifies the express limitation of the scope of the license to "a sulfuric acid plant," and that simply infers permission for acid "terminalling and transferring" where none is expressed, should be avoided. McAbee, 97 F.3d at 1435; Restatement (Second) of Contracts § 203(a).

Equally important, Xavier's reading of the subcontract fails to give full effect to the hazardous materials clause. The latter provides that ICI shall not unreasonably withhold its permission for Xavier to, among other things "bring, use or store" a hazardous substance at the VAAP, provided the substance is "required for the operation and maintenance of the Facilities." Def. App. 32 (emphasis added). Xavier stretches the term "required" in this clause beyond recognition.

According to Xavier, if its importation of sulfuric acid relates to any possible use of the facilities listed in appendix A of the agreement, then the importation of the acid is somehow "required" in order for Xavier to use those facilities. Pl. Br. 5. That reasoning is just circular: Xavier could not be "required" to "bring" saleable sulfuric acid to the base, in order simply to run "a sulfuric acid plant," Def. App. 25, unless the term "sulfuric acid plant" itself necessarily implied bringing that acid to the VAAP. We have demonstrated that the opposite is true: Operating an acid "plant" means manufacturing acid, not shipping it in from elsewhere for distribution by

truck. That the latter activity is arguably not "inconsistent" with manufacturing, Pl. Br. 5, is beside the point. The subcontract allows only a "plant."

Should the Court wish to consider parol evidence, ICI confirmed contemporaneously with its negotiations of Xavier's subcontract that ICI understood the agreement the same way we do. ICI's July 1996 request for Army approval of the proposed subcontract states that Xavier "will manufacture various grades of sulfuric acid (including oleum) and related products." Def. App. 16. ICI mentions only manufacturing and says nothing about "terminalling and transferring," or bringing acid to the base from elsewhere.

Just as revealing is the following question and answer in the accompanying "checklist" for approval completed by ICI:

> 6. Does the activity/process involve bringing hazardous waste on-site for use, treatment, storage or disposal? Explain in detail. (40 C.F.R. 264/265);
>
> **No**

Def. App. 19 (bold text in original). Although, under Xavier's interpretation of the subcontract, this one-word answer could be <u>technically</u> correct - because saleable sulfuric acid, although hazardous, is not a "waste" - in light of the question, one would expect ICI to have advised the Army somewhere that Xavier contemplated bringing railcars of hazardous acid onto the VAAP, had the parties intended to allow that. ICI did not.

Finally, Xavier's argument that advance review and approval by the Army of Xavier's planned commercial activities was no longer required, or "would have made no sense," after the termination of ICI's prime management contract in 1998 is mistaken. Pl. Br. 5-6. Article 1 of Xavier's facilities use agreement states that the Army "is the owner of [the] VAAP and ICI is the United States Army's Contractor for the use of VAAP." Def. App. 32. The Army remained the owner at all times. There is thus no inconsistency in preserving the requirement of owner approval, even assuming the Army became bound to the subcontract. The Army's denial of permission for Xavier to conduct activities beyond the terms of its use license was not a breach.

## II. Xavier's Freestanding Claim Of "Repudiation" Fails In The Absence Of Any Associated Damages

Xavier argues, in the alternative, that "[w]holly apart from their allegations regarding access to the railroad lines," counts I and II of the complaint "state a claim of repudiation." Pl. Br. 6-7. The fatal flaw in this argument is that a repudiation "claim," standing alone, cannot entitle Xavier to any monetary relief in this Court. Repudiation is a form of anticipatory breach. As such, it can provide grounds "to believe that the obligor will commit a breach by non-performance that would of itself give the obligee a claim for damages for total breach . . . ." Restatement (Second) Contracts § 251(1) (emphasis added). Repudiation standing alone, however, only allows the

non-breaching party to "suspend any performance for which he has not already received the agreed exchange," id., and, if the non-breaching party does not receive adequate assurances that the other party will perform, to terminate performance. Id. § 253; Danzig v. AEC Corp., 224 F.3d 1333, 1337-38 (Fed. Cir. 2000); National Union Fire Ins., ASBCA No. 34744, 90-1 BCA ¶ 22,226.

The damages recoverable by the non-breaching party under those circumstances are only those damages attributable to the non-performance: No separate category of damages is available for a freestanding "claim" of repudiation. See Restatement (Second) §§ 243, 251(1), 253. Stated another way, repudiation alone is not redressable; non-performance of a contract is redressable. Thus, since, as demonstrated above, the non-performance of which Xavier complains in counts I and II – the Army's refusal to allow "terminalling and transferring" – was not a breach and, therefore, caused no breach damages, whether the Army "repudiated" the contract in words makes no difference.

If the Court agrees with us that the Xavier-ICI subcontract does not provide for terminalling and transferring, Xavier's bare allegation of "repudiation" fails to state a claim upon which the Court could grant relief. Counts I and II should be dismissed.

III. The Termination Was Substantively And Procedurally Sound

A similar misunderstanding of the relationship between repudiation and non-performance infects Xavier's arguments

regarding the propriety of the Army's August 2001 termination of the alleged contract for default. Xavier argues there that, prior to August 2001, the Army's refusal to recognize contractual privity with Xavier "terminate[d] the contract, relieving [Xavier] of its remaining duties of performance." Pl. Br. 10 (quoting Alaska Pulp Corp., Inc. v. United States, 48 Fed. Cl. 655, 659 (2001) (bracketed text added)).

That argument proves far too much. For, assuming the Army was in material breach prior to August 2001, Xavier had two options at that point. It could (1) stop all performance and sue for total breach, or (2) continue to occupy the VAAP, and to perform the alleged contract, and retain only claims for partial breach under the contract. Cities Serv. Helex, Inc. v. United States, 543 F.2d 1306, 1313-14 (Ct. Cl. 1976).

Because Xavier "elect[ed] . . . to continue the contract, the obligations of both parties remain in force and the injured party may retain only a claim for damages for partial breach." Id. at 1314; see also Mobil Oil Explor'n & Prod'g S.E., Inc. v. United States, 530 U.S. 604, 622 (2000) ("[A]cceptance of performance . . . can constitute a waiver of the right to restitution . . . ."); 2 E.A. Farnsworth, Farnsworth on Contracts § 8.15 (2d ed. 1998). Xavier, in short, cannot have it both ways: It cannot now argue that the contract was "terminated" prior to August 2001, when Xavier's entire course of conduct, and

this lawsuit, are premised upon its allegation that the parties' obligations remained in force.

As demonstrated in our moving brief, Xavier's repeated failures to meet its obligations entitled the Army to terminate the contract (assuming it existed) in August 2001 without providing a cure notice or yet another opportunity for cure. Although some facts relating to the termination may be in dispute, the two central and dispositive disagreements between the parties involve pure issues of law.

The first such legal question involves the interpretation of the contract's default clause. As explained in our moving brief, that clause identifies a failure to make an annual payment as a condition of default and entitles Xavier to "only one" cure notice and "only one" opportunity to cure a payment default "during any 360[-]day period . . . ." Def. App. 34. The issue is whether the 360 days between cure opportunities is measured from the issuance of the first cure notice, as Xavier argues, Pl. Br. 7, or from the date the first default is cured (here, the date Xavier made its 2000 payment). We demonstrated that the plain language requires the latter interpretation. Def. Moving Br. 13-14. Xavier's only response is conclusory and fails to rebut our analysis of the default clause. Pl. Br. 7.

The second legal question is whether Xavier's alleged posting of a supplemental surety bond in January 1999 altered the

requirements of the default clause by requiring ICI (and the Army, assuming it succeeded ICI) to look to the bond to satisfy Xavier's payment obligations. Id. at 8. Xavier cites absolutely no language in its alleged, supplemental agreement with ICI that could impose such a requirement. The default clause provides that a default occurs if Xavier "allow[s] any payment . . . to be in arrears more than 30 days after written notice of such delinquency," Def. App. 34, and Xavier does not allege that the clause was amended to refer to the surety bond. Accordingly, Xavier's non-payment in 2001 constituted a second contractual default within 360 days, justifying immediate termination.

We also demonstrated, and Xavier does not dispute, that it brought railroad cars of sulfuric acid onto the VAAP without permission twice within 360 days, in December 2000 and August 2001. Def. Moving Br. 14-15. The seriousness and sheer number of Xavier's material breaches in the 360 days prior to August 17, 2001 amply justified termination, if a contract existed.

CONCLUSION

For these reasons, we respectfully renew our request that the Court dismiss counts I and II, enter summary judgment for defendant upon counts III and IV, and dismiss the complaint.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

MARK A. MELNICK
Assistant Director

s/Kyle Chadwick
KYLE CHADWICK
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7562
Fax: (202) 305-7644

Attorneys for Defendant

OF COUNSEL:

CAPT. TIMOTHY J. RYAN
Trial Attorney
U.S. Army Litigation Center
Contract Appeals Division
Arlington, VA

December 15, 2003

CERTIFICATE OF FILING

I hereby certify that on December 15, 2003, a copy of foregoing Notice of Appearance was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Kyle Chadwick