# In the United States Court of Federal Claims

**No. 03-1823C**
**(Filed February 10, 2004)**
**UNPUBLISHED**

| | | |
|---|---|---|
| **XAVIER CHEMICAL COMPANY,** | * | |
| **Plaintiff,** | * | **Contract interpretation;** |
| **v.** | * | **Termination for default.** |
| **THE UNITED STATES,** | * | |
| **Defendant.** | * | |

***Robert Keith Huffman***, Washington, D.C., attorney of record for plaintiff and ***Lisanne E.S. Cottington***, of counsel.

***Kyle Eric Chadwick***, Department of Justice, Washington, D.C., with whom was ***Assistant Attorney General Peter D. Keisler***, for defendant. ***David M. Cohen***, Director, and ***Mark A. Melnick***, Assistant Director.

***Capt. Timothy J. Ryan***, United States Army, of counsel.

**OPINION**

***Futey***, **Judge**.

This government contracts case is before the court on defendant's motion to dismiss for failure to state a claim and partial motion for summary judgment. Plaintiff opposes defendant's motion to dismiss and partial motion for summary judgment, but does not cross-move for summary judgment. The parties dispute the interpretation and scope of their agreement, with each party citing to the relevant contract terms and provisions which purportedly support their respective positions. The resolution of the controversy in this case also centers around delicate issues of timing concerning whether a contractor can be terminated for default despite its apparent belief and allegation that the government previously breached or repudiated the contract.

For purposes of its motion, defendant assumes that it became a party to plaintiff's facilities use contract with ICI Americas, Inc. (ICI) or that plaintiff was an intended third-party beneficiary of defendant's December 9, 1998, close-out agreement with ICI. Defendant maintains that its alleged failure to clear the railway tracks was not a breach of contract as the contract only permitted plaintiff to operate a sulfuric acid production "plant" and did not authorize plaintiff to use the facilities as a terminal or transfer site. Defendant also contends that plaintiff was properly terminated because it was in default of its payment obligations twice within a 360-day period. In addition, defendant alleges that plaintiff was in violation of "other condition[s]" of its agreement within a 360-day period. On the other hand, plaintiff asserts that the contract plainly contemplated its use of the facilities to terminal and transfer sulfuric acid. Plaintiff also avers that defendant improperly terminated the contract for default. Lastly, plaintiff maintains that its alleged failure to perform pursuant to the terms of the facilities use contract was nevertheless excused by defendant's prior material breach and repudiation.

Factual Background

During World War II, the Army Corp of Engineers constructed the Volunteer Army Ammunition Plant (VAAP) in Chattanooga, Tennessee. At that time, the United States Army (Army) primarily manufactured explosives at the VAAP for use in the war. The VAAP was subsequently placed in standby status from January 1946 until the spring of 1952 when it was reactivated during the Korean War. Following the Korean War, the VAAP was again reactivated during the Vietnam War. As of today, however, the VAAP remains in inactive status.

The VAAP occupies approximately 7,000 acres of land and holds 405 buildings. The complex is supported by vast utility and transportation infrastructure. There are twenty-three miles of railroad tracks and eighty-three miles of roadway on the premises. In addition, the VAAP contains a barge and unloading facility which provide access to and use of the Tennessee River.

The VAAP is what is known as a government-owned contractor-operated facility. In November 1994, the Army, acting through its Operation Support Command, entered into a five-year facilities use contract with ICI.[1] Pursuant to the Armament Retooling and Manufacturing Support Act of 1992, Pub. L. No. 102-484, the Army was permitted to authorize ICI to "enter into multiyear subcontracts for the commercial use of the [Army's facilities] . . . ." The Army exercised this discretion and granted ICI the following right:

---

[1] Contract No. DAAA09-94-E-0017.

> [T]o enter into tenant use contracts under this facility use contract during the term hereof for specific uses of the facility as approved by the Government for time periods not to exceed twenty five (25) years from the date of the tenant use contract, [notwithstanding] the fact that said time period may exceed the term of this contract.[2]

ICI, in turn, entered into a facilities use contract with plaintiff, Xavier Chemical Company, in June 1996. The express language of the contract provided that plaintiff could "use certain facilities at VAAP . . . for the use as a sulfuric acid plant."[3] Amongst the facilities identified in the appendix to the agreement was Building 101 which was labeled as "Acid Storage & Related Loading Facilities."[4] According to plaintiff, the facilities use contract allowed it "to operate a sulfuric acid regeneration ("SAR") plant and related facilities on the VAAP and to engage in related operations."[5] Although it is a point of contention between the parties, the term of said agreement was allegedly twenty-five years with two option periods of an additional twenty-five years apiece.

On March 30, 1998, the Army and ICI agreed that their contract would terminate on December 31, 1998. The Army notified plaintiff of this development on November 18, 1998, and emphasized the need for the Army and plaintiff to enter into an agreement that would "sever ICI's responsibility . . . , establish privity of contract between [plaintiff] and the Army and confirm that the agreement in Army possession is the most current agreement between the parties."[6] On December 9, 1998, the Army entered into a close-out agreement with ICI indicating that ICI's responsibilities would be relinquished as of January 1, 1999, and that the Army would assume any responsibilities under the subcontracts thereafter. By letter dated December 30, 1998, the Army informed plaintiff that because an acceptable three-party agreement was not reached, it would only be permitted to remain at the VAAP on a month-to-month basis. Plaintiff, however, informed the Army that it did not view such an agreement as necessary in light of the facilities use contract's attornment provision.

---

[2] Appendix To Defendant's Motion To Dismiss And For Partial Summary Judgment (App.) at 12.

[3] ***Id.*** at 25.

[4] ***Id.*** at 38; see also ***id.*** at 46 (describing Building 101 as "Acid Storage and Loading").

[5] Complaint (Compl.) ¶ 10.

[6] ***Id.*** ¶ 15.

The differences between the parties respective positions widened in August 2000. Plaintiff attempted to commence what it termed the "first of its operational phases under the [facilities use contract] - the transfer of sulfuric acid."[7] Plaintiff asserts, however, that it could not begin its operations because the Chattanooga Railcar Services (CRS) was storing railcars on the tracks at the VAAP. On multiple occasions in August 2001, plaintiff requested that the Army clear the tracks so that it could proceed with its operations.

Numerous correspondences would be exchanged over the next several months. Plaintiff sent a letter on August 28, 2000, to the Army, which according to plaintiff went unanswered, asking the Army to affirm that it was not repudiating the contract. On October 10, 2000, plaintiff again sent a letter requesting that the tracks be cleared. The Army responded to plaintiff's inquiries on November 14, 2000, and indicated that "terminalling and transferring" activities were outside the scope of the contract. The Army also indicated that plaintiff was only entitled to the "non-exclusive" use of the tracks, and was required to obtain approval from the Army prior to bringing hazardous substances onto the VAAP. Further, the Army stated that plaintiff's operations needed regulatory approval. By letter dated November 22, 2000, plaintiff disputed each of the Army's assertions.

Nevertheless, on December 8, 2000, plaintiff removed its own railcars from the VAAP in response to the Army's demands. On December 20, 2000, the Army sent plaintiff a letter which provided, in pertinent part, that "[t]he Army views [a] month-to-month authorization as the extent of [plaintiff's] real property interest. The [facilities use contract] did not attorn to the Army, as the Army was not a party to the [facilities use contract] and never authorized ICI to grant attornment."[8]

The parties continued their discussions over the next couple months. On August 17, 2001, however, the Army invoked the facilities use contract's default clause and terminated the contract without providing written notice and an opportunity to cure. The default clause provided that plaintiff could be terminated if it:

> allow[ed] any payment required hereunder this Agreement to be in arrears more than thirty (30) days after written notice of such delinquency (only one such written notice and only one such opportunity to cure shall be allowed during any 360 day period), or . . . remain[ed] in default under any other condition of this Agreement for a period of thirty (30) days after

---

7 ***Id.*** ¶ 21; see also App. at 61, 67.

8 Compl. ¶ 29.

> written notice from ICI (only one such written notice and only one such opportunity to cure shall be allowed during any 360 day period) . . . .[9]

As a basis for the termination for default, the Army relied on plaintiff's failure to make a timely annual rental payment on August 1, 2001, and failure to maintain pollution insurance coverage. The Army also cited to plaintiff's improper storing of railcars at the VAAP in August 2001. The Army justified not providing plaintiff with a written notice and opportunity to cure for the late rental payment in August 2001 on the basis that plaintiff's previous opportunity to cure extended until September 14, 2000, the date that plaintiff cured its previous payment default, and that 360 days had not elapsed since that time.

Plaintiff filed suit in this court on August 4, 2003, seeking restitution and non-overlapping reliance damages. Counts I and II of plaintiff's complaint alleged that defendant breached and repudiated the facilities use contract and the December 9, 1998, close-out agreement.[10] Counts III and IV alleged improper termination for default which, according to plaintiff, likewise amounted to a breach of the facilities use contract and the December 9, 1998, close-out agreement.[11] In lieu of an answer, defendant filed its Motion To Dismiss In Part And For Partial Summary Judgment on October 2, 2003. Defendant moved to dismiss Counts I and II for failure to state a claim upon which relief can be granted, and moved for summary judgment on Counts III and IV. Plaintiff filed its opposition on November 14, 2003. Defendant replied on December 15, 2003. The case is, therefore, ready for disposition.

Discussion

Prior to turning to the parties' arguments, the court notes that plaintiff directs the court's attention to documents outside its pleadings to support its contract interpretation. **RCFC** 12(b) provides that a motion to dismiss for failure to state a claim shall be treated as a motion for summary judgment under **RCFC** 56 if "matters outside the pleading are presented to and not excluded by the court . . . ." **RCFC** 12(b); see also ***Figueroa v. United States***, 57 Fed. Cl. 488, 504 (2003) (citing ***Rockefeller Ctr. Props. v. United States***, 32 Fed. Cl. 586, 589 n.6 (1995)); ***Maniere v. United States***, 31 Fed. Cl. 410, 420 n.5 (1994) ("Certainly any of the evidentiary materials that are typically submitted in conjunction with a motion for summary judgment, such as affidavits . . . and the like should be considered to be 'outside the pleading.'"). This proposition holds true despite the fact

---

[9] App. at 34.

[10] Compl. ¶¶ 44-49.

[11] ***Id.*** ¶¶ 50-55.

that the materials were supplied by the nonmoving party. ***White Mountain Apache Tribe of Arizona v. United States***, 9 Cl. Ct. 1, 11 (1985).

Further, although defendant labels a portion of its motion as one to dismiss for failure to state a claim upon which relief can be granted, both parties appear to agree that resolution of Counts I and II requires the court to engage in contract interpretation. The United States Court of Appeals for the Federal Circuit (Federal Circuit) has made clear that "[c]ontract interpretation is a question of law generally amenable to summary judgment." ***Varilease Tech. Group, Inc. v. United States***, 289 F.3d 795, 798 (Fed. Cir. 2002) (citing ***Textron Def. Sys. v. Widnall***, 143 F.3d 1465, 1468 (Fed. Cir. 1998)). Accordingly, the court will treat the portion of defendant's motion to dismiss for failure to state a claim as a motion for summary judgment.

I. Repudiation & Material Breach

At the outset, plaintiff's prior material breach and repudiation arguments do not excuse its failure to make timely rental payments, or its obligation to abide by "other condition[s]" of the facilities use contract. There is no doubt that repudiation by defendant could excuse plaintiff's performance obligations. See Restatement (Second) of Contracts § 254 (1981). It is equally clear that upon repudiation plaintiff would have the option of terminating the contract or continuing it. ***Dow Chemical Co. v. United States***, 226 F.3d 1334, 1344 (Fed. Cir. 2000). While there is "no specific time limit within which the non-repudiating party must elect his remedy . . . if the non-repudiating party himself defaults on the contract before he elects to accept the breach, the other party has the right to act upon his default." ***Silver Air v. Aeronautic Dev. Corp. Ltd.***, 656 F. Supp. 170, 178 (S.D.N.Y. 1987); see also ***Cities Serv. Helex v. United States***, 211 Ct. Cl. 222, 238 (1976) (explaining that "the Government's right to terminate - remains in effect, regardless of any prior breach by the Government, where the contractor fails to put an end to the contract for government breach before the Government exercises its right to terminate");[12] ***Canderm Pharmacal, Ltd. v. Elder Pharms., Inc.***, 862 F.2d 597, 603-04 (6th Cir. 1988); ***Apex Pool Equip. Co. v. Lee***, 419 F.2d 556, 562 (2d Cir. 1969). Defendant's alleged prior material breach and repudiation, therefore, would not excuse plaintiff's subsequent nonperformance.

---

[12] The Court of Claims also noted in ***Cities Service*** that under the modified and more lenient variations of the election doctrine, it is imperative that the material breach be acted upon "before the Government took any action to terminate [the contract] . . . ." ***Cities Serv.***, 211 Ct. C1. at 238-39 (citing ***N. Helex Co. v. United States***, 197 Ct. Cl. 118, 134 (1972)).

II. Contract Interpretation

Defendant avers that plaintiff was limited by the terms of the contract to operating a "sulfuric acid plant." Defendant asserts that plaintiff cannot point to a contract provision which authorizes "terminalling and transferring" activities. Defendant contends that it could withhold its consent and prevent plaintiff from "bring[ing]" hazardous substances onto, or "us[ing]" hazardous substances on, the premises unless said substances were "required for the operation or maintenance of the Facilities."[13] Defendant maintains that plaintiff could not commence operations without obtaining the Army's approval. Further, defendant avers that plaintiff was responsible for ensuring that it had received the necessary permits and licenses for its operations. Defendant also asserts that the contract only granted plaintiff the "non-exclusive use" of the railways and that the burden was on plaintiff to negotiate directly with the railroad operators.

Plaintiff maintains that the contract permitted it to use Building 101, which was characterized as "Acid Storage & Related Loading Facilities," in connection with operating a "sulfuric acid plant." According to plaintiff, Building 101 is a "terminalling, storage, and loading facility."[14] Plaintiff also contends that it was granted the "non-exclusive use of the railroad facilities at VAAP." Further, plaintiff avers that it notified defendant that its "terminalling and transferring" of sulfuric acid was the "initial phase of the sulfuric acid manufacturing plant."[15] Plaintiff asserts that defendant could not unreasonably withhold consent because the sulfuric acid was required for the operation of Building 101. Plaintiff also avers that once the Army stepped into ICI's shoes, its approval was no longer required.

The issue in this case, plainly stated, is whether the terms of the facilities use contract as memorialized authorized plaintiff to conduct "terminalling and transferring" operations at the VAAP. Resolution of this issue involves the interpretation of several contract provisions. First, the contract granted plaintiff "a license to use certain facilities at VAAP (identified in Appendix A and hereinafter called the 'Facilities') for the use as a sulfuric acid plant."[16] Second, the contract stated that plaintiff "shall not treat, dispose, bring, use or store at the VAAP any Hazardous Substances . . . unless [it] first obtained

---

[13] App. at 32.

[14] Plaintiff's Opposition To Defendant's Motion To Dismiss In Part And For Partial Summary Judgment (Pl.'s Opp'n) at 4 (citing Kowalski Declaration ¶ 2).

[15] App. at 61; see also ***id.*** at 67.

[16] ***Id.*** at 25.

ICI's written consent and ICI's consent shall not be unreasonably withheld provided such Hazardous Substances are required for the operation and maintenance of the Facilities."[17] Third, plaintiff was provided with the "non-exclusive use of the railroad facilities at VAAP . . . [and] the right to negotiate directly with the railroad(s) in order to establish the . . . necessary rail service contracts for rail service operation . . . at VAAP . . . ."[18]

When discerning the meaning of contractual provisions, one must keep in mind that parol evidence generally may not be used to vary the unambiguous terms of an agreement. ***W&F Bldg. Maint. Co., Inc. v. United States***, 56 Fed. Cl. 62, 68 (2003) (citing ***A Olympic Forwarder, Inc. v. United States***, 33 Fed. Cl. 514, 524 (1995)). If the court finds that the terms of the facilities use contract are unambiguous, resort to extrinsic evidence as an interpretive aid would be inappropriate. ***Id.*** at 69. The mere fact that the parties disagree as to the meaning of a term, however, does not render said term ambiguous. ***Metric Constructors, Inc. v. NASA***, 169 F.3d 747, 751 (Fed. Cir. 1999). An ambiguity does arise when the term is susceptible to more than one reasonable interpretation. ***Id.*** ("[B]oth interpretations must fall within a 'zone of reasonableness.'").[19]

The plain language of the contract indicates that plaintiff only had a license to use the facilities as a "sulfuric acid plant." The contract's consent clause which limited defendant's ability to withhold consent could only be invoked where the "Hazardous Substances [were] required for the operation and maintenance of the Facilities." It is important to remember, however, that the contract provided that the "Facilities" could only be used as a "sulfuric acid plant." Paragraph 12(b), therefore, is more appropriately read as "Hazardous Substances [were] required for the operation and maintenance of [a sulfuric acid plant]." Plaintiff's "non-exclusive use of the railroad facilities" was also presumptively limited to its operation of a "sulfuric acid plant." Accordingly, the resolution of this issue turns on the interpretation of the word "plant."

Defendant maintains that the term "plant" only contemplates the use of the "Facilities" in conjunction with the manufacture or production of sulfuric acid. Defendant also contends that it could withhold its consent because the importation of sulfuric acid was

---

17 ***Id.*** at 32.

18 ***Id.*** at 39.

19 Irrespective of the contract's integration or completeness, extrinsic evidence is independently admissible to aid in the interpretation of ambiguous terms. ***McAbee Constr., Inc. v. United States***, 97 F.3d 1431, 1434 (Fed. Cir. 1996); see also E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS § 7.3, at 218 (2d ed. 1998).

not "required" for the operation of a sulfuric acid manufacturing plant. On the other hand, plaintiff contends that the term "plant" entitled it "to operate a sulfuric acid regeneration plant ("SAR") plant and related facilities on the VAAP and to engage in related operations."[20] Plaintiff avers that its interpretation is evidenced by the fact that Building 101 is listed as an "Acid Storage & Related Loading Facility" and that plaintiff was granted the "non-exclusive use of the railroad facilities at VAAP."[21] Plaintiff also maintains that defendant could not unreasonably withhold its consent because the imported sulfuric acid was "required" for the operation of Building 101, which was a "terminalling, storage, and loading facility."

The court finds that both of the parties' interpretations "fall within a 'zone of reasonableness.'" See ***Metric Constructors***, 169 F.3d at 751. "Plant" may be defined as "the land, buildings, machinery, apparatus, and fixtures employed in carrying on a trade or a mechanical or other industrial business"[22] or as "a factory or workshop for the manufacture of a particular product."[23] It was reasonable for defendant to interpret the contract as limiting plaintiff to the "manufacture of a particular product," which in this case was sulfuric acid. It was also reasonable for plaintiff to believe that its use was consistent with that commonly "employed in carrying on a trade . . . ." The term "plant" could, therefore, be deemed ambiguous in this context. See ***id.***

Because the court has reached this conclusion, it may use extrinsic evidence to assist its interpretation. Plaintiff has offered the affidavit of its President, which purports to explain that Building 101 was a "terminalling, storage, and loading facility." Plaintiff also points to several letters written in November and December 2000 which state that the "initial" or "first" phase of its operation involves the "terminalling and transferring" of sulfuric acid. On the other hand, defendant relies on the "Arms Initiative Facility Use Request Proposal" (Proposal) plaintiff submitted on July 3, 1996.

The court is aware that the Federal Circuit has held that summary judgment is not appropriate where contract interpretation involves the weighing of extrinsic evidence. ***Beta Sys., Inc. v. United States***, 838 F.2d 1179, 1183 (Fed. Cir. 1988). The Federal Circuit's holding, however, does not preclude a finding against plaintiff on this issue. It is

---

[20] Compl. ¶ 10.

[21] Pl.'s Opp'n at 4.

[22] WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE (UNABRIDGED) 1731 (1993).

[23] ***Id.***

well-established that "the principle objective in interpreting the contractual language is to discern the parties' intent *at the time the contract was executed*." ***Capital Props., Inc. v. United States***, 56 Fed. Cl. 427, 431 (2003) (emphasis added) (citing ***Winstar Corp. v. United States***, 64 F.3d 1531, 1538 (Fed. Cir. 1995)); ***Dureiko v. United States***, 209 F.3d 1345, 1356 (Fed. Cir. 2000); ***Veit & Co., Inc. v. United States***, 56 Fed. Cl. 30, 34 (2003).

At the time the parties entered into the facilities use contract, plaintiff's contemporaneous submissions pointed solely to the manufacture or production of sulfuric acid at the VAAP. For instance, in the Executive Summary contained in its Proposal, plaintiff explained that its "use of the sulfuric acid plant and related facilities" would consist of the "*manufacture* [of] various grades of sulfuric acid (including oleum) and related products."[24] In another section of the Proposal, plaintiff again described its proposed use in the following manner: "The facilities and equipment will be used for the *production* of sulfuric acid."[25] This position was consistent with defendant's interpretation of the contract as well. Although plaintiff has proffered several letters from late 2000 which reference transferring activities, these letters do not reflect the parties' interpretation of the contract at the time it was entered into. Therefore, given that the parties' contemporaneous interpretation of contractual provisions is afforded almost controlling weight, the court holds that the facilities use contract did not authorize plaintiff to conduct "terminalling and transferring" of imported sulfuric acid at the VAAP. ***Merritt-Chapman & Scott Corp. v. United States***, 178 Ct. Cl. 883, 905 (1967) (holding that plaintiff's interpretation before there was any controversy between the parties, which was the same as defendant's interpretation, was "entitled to great, if not controlling, weight").

III. Termination for Default

Defendant maintains that it properly terminated the contract for default. Defendant contends that plaintiff was not entitled to a written notice and opportunity to cure in August 2001, because plaintiff was provided with a written notice and opportunity to cure within the previous 360 days. Defendant also asserts that the termination was justified because plaintiff defaulted on several "other condition[s]" within a 360-day period. Specifically, defendant avers that plaintiff was provided with a constructive cure notice in December 2000 when it was instructed to remove railcars containing sulfuric acid from the VAAP. Defendant also maintains that plaintiff failed to pay for insurance coverage as required under the contract. Lastly, defendant contends that in August 2001 plaintiff again brought railcars holding sulfuric acid onto the premises.

---

[24] App. at 16 (emphasis added).

[25] ***Id.*** at 17 (emphasis added).

Plaintiff maintains that it should have received a written notice and opportunity to cure on August 17, 2001, as more than 360 days had passed since its last written notice. Plaintiff also contends it was entitled to separate written notices and opportunities to cure for payment defaults and "other condition[s]." Plaintiff asserts that it did not default on its payment in August 2001 because it had posted a supplemental surety bond which should have been used to satisfy the payment. Plaintiff also avers that the December 2000 letter was not a constructive cure notice as it did not mention that plaintiff was in material breach of the facilities use contract, and was not referenced in the termination letter. Further, plaintiff maintains that there was no lapse in pollution insurance coverage. Plaintiff also contends that the August 2001 railcar incident could not justify termination without a violation of an "other condition" in the preceding 360 days.

It is well-established that a contracting officer (CO) possesses the authority to terminate a contract for default. ***Mega Constr. Co., Inc. v. United States***, 25 Cl. Ct. 735, 741 (1992) (citing ***Schlesinger v. United States***, 182 Ct. Cl. 571 (1968)). When exercising this power, the CO must be cognizant of the fact that a "default-termination is a drastic sanction . . . which should be imposed (or sustained) only for good grounds and on solid evidence." ***Lisbon Contractors, Inc. v. United States***, 828 F.2d 759, 765 (Fed. Cir. 1987) (quoting ***J.D. Hedin Constr. Co. v. United States***, 187 Ct. Cl. 45, 57 (1969)). The burden is on the government to demonstrate by a preponderance of the evidence that the termination for default was justified. ***Mega Constr.***, 25 Cl. Ct. at 741 (citing ***Lisbon Contractors***, 828 F.2d at 765); see also ***McDonnell Douglas Corp. v. United States***, 323 F.3d 1006, 1015-16 (Fed. Cir. 2003). Although "[a] termination for default is a harsh remedy . . . when the court is convinced that the defendant exercised proper judgment in terminating the contract for default the court will not substitute its judgment for that of the [CO]." ***Int'l Verbatim Reporters, Inc. v. United States***, 9 Cl. Ct. 710, 715 (1986) (internal citation omitted). "Failure to provide notice and an opportunity to cure when required will render a default termination procedurally defective." ***Composite Laminates, Inc. v. United States***, 27 Fed. Cl. 310, 317 (1992) (citing ***Kisco Co., Inc. v. United States***, 221 Ct. Cl. 806, 821 (1979)).

The contract provides that if plaintiff "remain[ed] in default under any other condition of this Agreement for a period of thirty (30) days after written notice from ICI (only one such written notice and only one such opportunity to cure shall be allowed during any 360 day period) . . . ."[26] This provision operates in the same manner as its payment counterpart. The first time plaintiff violates a condition of the contract it is afforded a written notice and opportunity to cure, however, these protective devices are offered only once during any 360-day period. If plaintiff violates another condition of the contract

---

[26] ***Id.*** at 25.

during that time frame, the contract may be immediately terminated for default. It is undisputed that plaintiff's alleged violations of "other condition[s]" occurred within a 360-day period.

The court must first resolve the issue of whether defendant's written notice concerning the storing of railcars containing sulfuric acid at the VAAP "constructively advised [plaintiff] that it was in material violation of the safety provisions of the facilities use agreement . . . [and] operated as a cure notice."[27] There is no doubt that the December 1, 2000, letter stated with specificity the problem that was to be corrected, and that it was to be corrected immediately. ***Int'l Verbatim Reporters***, 9 Cl. Ct. at 721 (discussing the level of particularity with which the alleged deficiency must be explained); Accord ***Halifax Eng'g, Inc. v. United States***, 915 F.2d 689, 691 (Fed. Cir. 1990). In contrast to defendant's August 17, 2000, letter, however, that letter makes no reference to plaintiff being in violation of the facilities use contract. ***Composite Laminates***, 27 Fed. Cl. at 321 ("Functionally, the requisites of a cure notice are that it must set forth both deficiencies in performance and threaten default."). When defendant intended that plaintiff be on notice that it was in default and that the letter it was receiving was its written notice and opportunity to cure, defendant expressly made its intentions known.[28] In addition, defendant by its own actions did not treat the December 1, 2000, letter as a cure notice until it made the argument in its briefs. Noticeably, the termination letter is void of any mention of the December 1, 2000, letter as a written notice and opportunity to cure whereas it goes into great detail about the August 17, 2000, letter serving such a purpose. The court, therefore, concludes that the December 1, 2000, letter was not the written notice and opportunity to cure as contemplated by paragraph 13 of the facilities use contract.

The inquiry now shifts to plaintiff's alleged failure to maintain pollution insurance and improper storage of railcars containing sulfuric acid at the VAAP. Plaintiff maintains that it had acquired the necessary pollution insurance coverage and that there was no lapse in coverage. Although defendant argued in its motion that plaintiff's failure to maintain insurance coverage justified the termination for default, defendant all but concedes in its reply brief that the issue concerning pollution insurance coverage may involve a factual dispute. Further, defendant's argument that no cure notice was required in August 2001 for a violation of an "other condition" rests on its assumption that the December 2000 letter operated as cure notice. Given the court's conclusion to the contrary, however, defendant would have been required by the terms of the facilities use contract to provide plaintiff with

---

[27] Defendant's Motion To Dismiss And For Partial Summary Judgment at 14 (citing ***Int'l Verbatim Reporters***, 9 Cl. Ct. at 721).

[28] See App. at 52.

a written notice and opportunity to cure a violation of an "other condition" on August 17, 2001.

As mentioned above, apart from the default provision governing "other condition[s]," the contract contains a default clause which addresses payments. In contrast to the alleged violations of "other condition[s]" the timing of the payment violations is critical in discerning whether plaintiff was properly terminated for default. Under the payment clause of paragraph 13, it is clear that plaintiff would not have been entitled to receive another written notice and opportunity to cure within 360 days of the August 17, 2000, written notice. The issue, of course, is not that clear. Plaintiff was terminated for default on August 17, 2001, more than 360 days after the first written notice, but less than 360 days from the expiration of the opportunity to cure or the date of the actual cure. If the 360-day period, therefore, ran from the date of the written notice, plaintiff was entitled to another written notice on August 17, 2001. Conversely, if the period ran from the date of the cure, or the end of the cure period, plaintiff was properly terminated for default. The resolution of this issue hinges on contract interpretation - - whether the written notice and opportunity to cure provision runs from the date of the written notice or from the date of the cure.

The default provision explicitly indicates that neither a written notice nor an opportunity to cure can overlap in any 360-day period. Plaintiff did not make a timely rental payment on August 1, 2000, and was in default of its contractual obligations until September 14, 2000, the date that it eventually submitted its rental payment. Plaintiff's opportunity to cure, therefore, extended until that date and, according to the terms of paragraph 13, plaintiff was not entitled to another written notice or opportunity to cure until 360 days had elapsed. In other words, defendant was not obligated to provide plaintiff with a written notice and opportunity to cure until September 10, 2001. Had a written notice and opportunity to cure been provided on August 17, 2001, that notice and its corresponding opportunity to cure would have fallen within 360 days of the conclusion of its previous opportunity to cure. The court rejects plaintiff's interpretation to the contrary as it focuses solely on the date of the written notice and does not account for the time frame devoted to the opportunity to cure. See ***W&F***, 56 Fed. Cl. at 69 (quoting ***Arizona v. United States***, 216 Ct. Cl. 221, 235-36 (1978) ("[A]n interpretation which gives a reasonable meaning to all parts will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result.")). Plaintiff was, therefore, not entitled to a written notice and opportunity to cure on August 17, 2001.

Plaintiff maintains that the termination for default was nevertheless not justified because pursuant to an amendment to the facilities use contract executed on December 18, 1998, it posted a supplemental surety bond which could be utilized in the event of an

untimely payment. Plaintiff, however, has not demonstrated that the amendment somehow abridges or supercedes defendant's entitlement to terminate the contract for default under paragraph 13 of the facilities use contract. The court's task in this regard involves bringing harmony to potentially conflicting contractual provisions. ***Williams v. Taylor***, 529 U.S. 362, 404 (2000); see also ***W&F***, 56 Fed. Cl. at 69. If the court accepted plaintiff's interpretation that defendant was required to utilize the supplemental surety bond in the event of a default, paragraph 13 would be rendered meaningless. Stated another way, defendant simply would not be able to terminate the contract for nonpayment regardless of how many times plaintiff was in default during any 360-day period as long as there were funds available in the form of a supplemental surety bond. A more even-handed interpretation gives defendant the option of collecting the payment from the surety and continuing with the contract, or terminating the contract pursuant to paragraph 13 if the relevant conditions precedent had occurred. Such an interpretation gives meaning to both the supplemental surety bond amendment and paragraph 13 of the facilities use contract. Therefore, having decided that the 360-day period runs from the date of the cure and that the supplemental surety bond amendment did not eviscerate defendant's right to terminate the contract for default under paragraph 13 of the facilities use contract, the court concludes that defendant was entitled to terminate the contract for default on August 17, 2001, without providing written notice and opportunity to cure.

## Conclusion

For the above-stated reasons, defendant's Motion To Dismiss And For Partial Summary Judgment, which the court converted to a motion for summary judgment in its entirety, is hereby GRANTED. The Clerk of the Court is directed to enter judgment in favor of defendant. No costs.

IT IS SO ORDERED.

/s/ Bohdan A. Futey

**BOHDAN A. FUTEY**
**Judge**