# *United States Court of Appeals for the Federal Circuit*

04-5083

XAVIER CHEMICAL COMPANY

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

# *Judgment*

*ON APPEAL from the* UNITED STATES COURT OF FEDERAL CLAIMS

*in CASE NO(S).* 03-CV-1823

*This CAUSE having been heard and considered, it is*

*ORDERED and ADJUDGED:* **AFFIRMED**

*ENTERED BY ORDER OF THE COURT*

*DATED* APR - 5 2005

Jan Horbaly

*Jan Horbaly, Clerk*

CERTIFIED COPY
I HEREBY CERTIFY THIS DOCUMENT IS A TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE.

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

By: Jodi H Braun Date: 5-27-05

ISSUED AS A MANDATE: MAY 27 2005

NOTE: Pursuant to Fed. Cir. R. 47.6, this disposition
is not citable as precedent. It is a public record.

# United States Court of Appeals for the Federal Circuit

04-5083

XAVIER CHEMICAL COMPANY,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

---

DECIDED: April 5, 2005

---

Before LOURIE, SCHALL, and PROST, Circuit Judges.

SCHALL, Circuit Judge.

## DECISION

Xavier Chemical Company ("Xavier") appeals the final decision of the United States Court of Federal Claims that granted summary judgment in favor of the United States in Xavier's suit against the United States for breach and repudiation of an alleged contract between Xavier and the Department of the Army. Xavier Chem. Co. v. United States, No. 03-1823C (Ct. Cl. Feb. 10, 2004). We affirm.

## DISCUSSION

### I.

This case relates to the Volunteer Army Ammunition Plant ("VAAP") in Chattanooga, Tennessee. The VAAP is a government-owned property that once served as an ammunition manufacturing facility. In November of 1994, the Army awarded a contract to ICI Americas, Inc. ("ICI") for operation and maintenance of the VAAP. Under the contract, ICI was authorized to "enter into multiyear subcontracts for the commercial use" of the facility with third parties.

ICI entered into such a subcontract with Xavier. In July of 1996, ICI and Xavier executed a facilities-use contract that authorized Xavier to operate sulfuric acid production facilities at the VAAP (hereinafter, the "facilities-use agreement"), although the precise scope of the authorization is in dispute. Xavier was also granted use of the VAAP's railroad facilities on a non-exclusive basis. In March of 1998, the Army and ICI terminated their contract, and, in December of 1998, the Army executed an agreement with ICI "to effect orderly completion" of the operations and maintenance contract (hereinafter, the "close-out agreement").

The close-out agreement contemplated that ICI's responsibilities would cease as of January 1, 1999, and that the Army would then assume any responsibilities under existing subcontracts. By letter dated December 30, 1998, the Army informed Xavier that because an acceptable agreement had not been reached, it (Xavier) would only be permitted to remain at the VAAP on a month-to month basis. Eventually, on August 17, 2001, the Army invoked the facilities-use agreement's default clause and terminated

what Xavier alleges was a contract with Xavier without providing prior written notice and an opportunity to cure.

In August of 2003, Xavier filed suit against the government in the Court of Federal Claims. Xavier alleged that it had a contractual relationship with the Army as either a third-party beneficiary of the closeout agreement, or because the Army stepped into ICI's contractual obligations when the Army took over maintenance of the VAAP from ICI.

In Counts I and II of its complaint, Xavier alleged that the Army had breached and repudiated the facilities-use agreement and the closeout agreement. In Counts III and IV, Xavier alleged that the Army had improperly terminated for default its purported contract with Xavier because it had failed to adhere to the termination provisions of the facilities-use agreement.

The government moved for dismissal of Xavier's claims and for partial summary judgment. Although the government denied the existence of any contractual relationship between it and Xavier, it was willing to assume, solely for purposes of its motion, the existence of such a contractual relationship.

The Court of Federal Claims converted the motion for partial summary judgment into a motion for summary judgment and granted the motion. The court held that the Army had neither breached nor repudiated any contractual relationship, and that the Army's termination of the facilities-use agreement for default was not improper. This appeal followed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

II.

We review the Court of Federal Claims' decision granting summary judgment de novo. Ammex, Inc. v. United States, 384 F.3d 1368, 1371 (Fed. Cir. 2004). As no material facts appear to be in dispute in this case, we are presented with issues of law. In addition, for purposes of this opinion, we will assume that a contractual relationship existed between Xavier and the government.

III.

Xavier claims that the Army breached or repudiated the facilities-use and/or close-out agreements by not allowing it to use the VAAP as a terminal and transfer point for sulfuric acid products so that it could "seed" the local market. Although eventually Xavier's regional customers would have been served by sulfuric acid produced at the VAAP, Xavier wished to serve those customers before its production facility at the VAAP was complete. Thus, Xavier began shipping sulfuric acid produced elsewhere to the VAAP by rail and then transferring the acid to trucks for local distribution to customers. After a dispute over rail cars obstructing rail traffic, the Army informed Xavier that it could not use the VAAP for "terminalling" and "transferring" activities. It is this action that Xavier alleges constituted repudiation and/or breach of contract.

We first examine the issue of breach. Xavier notes that, under the facilities-use agreement, it was authorized to operate a sulfuric acid "plant." Xavier argues that the term "plant" has two definitions: 1) "the land, building, machinery, apparatus, and fixtures employed in carrying on a trade or a mechanical or other industrial business" or 2) "a factory or workshop for the manufacture of a particular product." Under the first, broader definition of plant, Xavier argues, its seeding operations were authorized.

We agree with the Court of Federal Claims that the facilities-use agreement did not authorize Xavier to haul sulfuric acid produced elsewhere to the VAAP for local distribution. We think that the agreement is unambiguous on its face, and therefore do not consider the extrinsic evidence submitted by Xavier or relied upon by the trial court. The agreement states:

> ICI hereby grants to [Xavier] a License to use certain facilities at VAAP (identified in Appendix A and hereinafter called the "Facilities") for use as a sulfuric acid plant.

This sentence makes clear that the term "plant" means a factory for producing sulfuric acid. The first part of the license grant identifies the facilities being licensed (those included in Appendix A), and the second part of the sentence identified the use to which said facilities may be put, as a "plant," i.e., "a factory or workshop to produce" sulfuric acid. Other sections of the agreement support this interpretation. The agreement notes that Xavier would upgrade the VAAP facilities "to a capacity of approximately 500 tons per day of sulfuric acid including conversion of the Sulfuric Acid Plant from a single absorption process to a double absorption process." This makes clear that the term "plant" was used in the context of manufacturing sulfuric acid. It was not used in the context of referring to land and operations generally.

Other aspects of the facilities-use agreement do not support Xavier's contention. First, Xavier points to the fact that ICI could not unreasonably withhold consent for Xavier to bring hazardous substances to the VAAP, "provided such Hazardous Substances are required for the operation and maintenance of the Facilities." As noted above, the grant by ICI to Xavier was for a "plant" to produce sulfuric acid. A straightforward reading of this provision is that Xavier will have reasonable permission

to bring to the VAAP hazardous materials required for the production of sulfuric acid within the plant.

Second, the fact that the facilities-use agreement provided Xavier with a terminal facility does not, without more, help Xavier's case. A terminal would be necessary for storing sulfuric acid produced at the VAAP prior to transport elsewhere. Thus, the inclusion of a terminal in the facilities-use agreement does not show that the agreement objectively contemplated that Xavier could haul sulfuric acid produced elsewhere to the VAAP.[1]

Xavier also argues that the trial court erred by not considering Counts I and II of its complaint as an independent claim that the Army repudiated the agreement. Xavier argues that various letters from the Army to Xavier denying that the Army was bound by the facilities-use agreement constituted a repudiation of the agreement between Xavier and the Army. We reject Xavier's repudiation argument.

"A repudiation is. . . a statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach[.]" RESTATEMENT (SECOND) OF CONTRACTS § 250 (1981) ("Restatement"). However, "acceptance of performance under a once-repudiated contract can constitute a waiver of the right to restitution that repudiation would otherwise create." Mobil Oil Exploration & Prod. S.E., Inc. v. United States, 530 U.S. 604, 622 (2000) (citing Restatement § 373, cmt. a). There simply was no repudiation in this case. As we have

---

[1] Xavier argues that "[t]he inference can reasonably be drawn from the documentary evidence in the record that transferring and terminalling were necessary to seed the market for sulfuric acid production at the VAAP." Reply Br. of Appellant, at 5-6. The problem that we have with this argument is that it assumes the very conclusion that Xavier is trying to prove—that the activities authorized by the facilities-use agreement were coextensive with Xavier's plan to "seed the market."

explained, under the agreement that existed between Xavier and the Army, Xavier had the right to use the VAAP to produce sulfuric acid. There is no indication that, up until the time the Army terminated the contract for default—the matter we address next—Xavier was barred from using the VAAP for that purpose, or was told that it could not use the VAAP for that purpose. Alternatively, by using the VAAP (albeit under terms with which it disagreed) Xavier waived any arguable repudiation.

We thus affirm the grant of summary judgment with respect to Counts I and II.

IV.

Counts III and IV of Xavier's complaint alleged that the Army's termination for default in August 2001 breached the facilities-use agreement or the close out agreement. The pertinent facts are as follows:

Xavier did not make a timely rental payment due on August 1, 2000. On August 17, 2000, the Army provided a written notice of the default. Xavier cured this default by submitting a payment on September 14, 2000. The following summer, Xavier failed to make a rental payment as required on August 1, 2001; the Army used this second default as the basis for termination of the agreement, without providing prior notice or an opportunity to cure.

Xavier argues that, before the Army could terminate the agreement for default, Article 13 of the agreement entitled Xavier to notice and a 30-day opportunity to cure the late payment. The pertinent provision provides:

> If [Xavier] shall allow any payment required hereunder this Agreement to be in arrears more than thirty (30) days after written notice of such delinquency (only one such written notice and only one such opportunity to cure shall be allowed during any 360 day period). . . ICI may, without notice to [Xavier], terminate this Agreement[.]

Xavier argues that "[i]n order to ensure that plaintiff is given both the notice and opportunity to cure guaranteed by the Agreement, the 360-day period of Article 13 must run from the beginning of the first notice and opportunity to cure period—here, August 17, 2000—to the beginning of the second notice and opportunity for cure period here, August 17, 2001." Under Xavier's interpretation, to properly terminate the facilities-use agreement, the Army was required to give Xavier another written notice and opportunity to cure on August 17, 2001.

The government argues, on the other hand, that the 360-day period should be measured from the date that the first default was cured. Under the government's interpretation, the Army did not need to give Xavier written notice and opportunity to cure its August 1, 2001 payment default, because the government was not required to provide Xavier another written notice and opportunity to cure until at least September 9, 2001 (360 days from September 14, 2000).

We agree with the government's interpretation of the termination provision. Xavier's interpretation does not comport with the plain language of the facilities-use agreement, which refers to both "written notice" and an "opportunity to cure." Xavier was only entitled to one opportunity to cure in any 360-day period. On September 14, 2000, Xavier had an opportunity to cure—and cured—the default of failing to make payment due on August 1, 2000. Providing Xavier with another opportunity to cure on August 17, 2001, would have meant that Xavier would have been provided with two opportunities to cure within one 360-day period (within the period September 14, 2000, to September 9, 2001), contrary to the plain language of the agreement.

Xavier argues that the trial court failed to properly consider the effect of a December 1998 amendment to the facilities-use agreement that established a surety bond to be used in the event Xavier did not make a timely payment. However, the trial court correctly rejected this argument, noting that Xavier had presented no evidence that this amendment superseded the facilities-use agreement's termination provision. We therefore affirm the grant of summary judgment with respect to Counts III and IV.

For the foregoing reasons, the final decision of the Court of Federal Claims is affirmed.

No costs.

CERTIFIED COPY
I HEREBY CERTIFY THIS DOCUMENT
IS A TRUE AND CORRECT COPY
OF THE ORIGINAL ON FILE.

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT
By: Jordan Brown Date: 5-27-05